IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ERIE INSURANCE EXCHANGE, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : Civil Action No. |
| | : 1:06CV00573 -- DAR |
| HAL WALLS et al., | : |
| | : |
| Defendants. | : |

# Exhibit 1 to Defendant Donald K. Hinkle's Statement of Material Facts as to Which There is No Dispute

# Excerpts of Deposition of Donald K. Hinkle

BRADFORD ASSOCIATES
DONALD HINKLE

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
CIVIL DIVISION

- - - - - - - - - - - x
                     :
ERIE INSURANCE EXCHANGE   :
                     :
   Plaintiff         :
                     :
   v.                : Case No.:
                     : 06-CV-573-ESH
HAL WALLS, et al     :
                     :
   Defendants       :
                     :
- - - - - - - - - - - x

Tuesday, February 6, 2007
Washington, D.C.

Deposition of

DONALD KEITH HINKLE

a witness, called for examination by counsel

for plaintiff, pursuant to notice, held at the

law offices of Roger C. Johnson, Esquire, Koonz,

McKenney, Johnson, DePaolis & Lightfoot, LLP,

2001 Pennsylvania Avenue, Suite 450, Washington,

D.C., 20006, beginning at 12:10 p.m., before

Rosemary C. Keane, a Notary Public in and for the

District of Columbia, when were present on behalf

of the respective parties:

BRADFORD ASSOCIATES
DONALD HINKLE

Page 6

1    Q   Did you do anything in preparation for
2  today's deposition other than meeting with,
3  perhaps, Mr. Johnson?
4    A   No, not really.
5    Q   Did you review any documents?
6    A   I reviewed some documents. I reviewed
7  my original statement to you; and, Hal's
8  statement.
9    Q   Is that the statement that you gave to
10 Erie?
11   A   Yes; and, my statement.
12   Q   When you say and my statement, are you
13 talking about two different statements?
14   A   Just the one from my original statement
15 to your insurance company.
16   Q   So just one statement you're talking
17 about?
18   A   Yes.
19   Q   Did you review the deposition
20 transcript of Hal Walls?
21   A   Yes.
22       MR. JOHNSON: I want to consult with

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Exceptional Service in Court Reporting and Litigation Support

BRADFORD ASSOCIATES
DONALD HINKLE

Page 7

1  my client for a minute.
2       (Thereupon, counsel conferred with
3       the witness.)
4       THE WITNESS: Yes. I looked at the
5  statement. To clarify that, not the deposition
6  transcript, but the statement I looked at.
7       BY MR. COX:
8    Q   Just so we're clear. It's my
9  understanding that Mr. Walls gave two separate
10 statements to Erie Insurance. Are you telling me
11 that you reviewed both of those -- they would
12 actually be transcriptions of the oral statements
13 that he gave to Erie; are those what you
14 reviewed?
15   A   Yes.
16   Q   So you didn't review the transcript of
17 his testimony when I asked him questions several
18 weeks ago?
19   A   No.
20   Q   Mr. Hinkle, we're here, as you probably
21 know, primarily to discuss your working
22 relationship with Hal Walls, in addition to some

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Exceptional Service in Court Reporting and Litigation Support

BRADFORD ASSOCIATES
DONALD HINKLE

Page 8

1  degree to the incident that happened on or about
2  August 29th of 2005.
3       In that respect and in connection with
4  this litigation, I had asked for you, through
5  your lawyers, to produce any document that you
6  might have that might be related to any of that;
7  and, I didn't get any documents. I mean, is that
8  because you don't have any documents?
9    A   Yes, I don't have any.
10   Q   So you have no documents that would
11 reflect or refer to any work that you have
12 ever done for Mr. Walls?
13   A   No.
14   Q   Would the same be true with respect to
15 any documents that would reflect the amount of
16 money or the number of hours that you worked for
17 Mr. Walls?
18   A   That is, also, true, I have nothing.
19   Q   Can you just run down for me your
20 educational background, basically, high school.
21   A   Well, I didn't -- I made it to tenth
22 grade and I took trade schools, I went to trade

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Exceptional Service in Court Reporting and Litigation Support

BRADFORD ASSOCIATES
DONALD HINKLE

Page 9

1  schools in electronics. I took a business course
2  and I took front-end alignment and electronics.
3  The course was in electronics and electrical.
4    Q   These were courses that you took in a
5  trade school after tenth grade?
6    A   Yes.
7    Q   Was it a local trade school?
8    A   It was in Chicago that I went to.
9    Q   Did you come away from the trade school
10 with any sort of diploma or certificate?
11   A   I did.
12   Q   What was that?
13   A   I had a certificate in electrical and,
14 like I said, in electronics and wheel alignments.
15 I did a course in wheel alignments, tune-ups.
16   Q   With respect to the certificate that
17 you received in electrical, what did you need to
18 do to get that certificate?
19   A   I had to study for a year. Then, I
20 had to go in for testing over a period of two
21 weeks in Chicago.
22   Q   What kind of electrical work did you

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Exceptional Service in Court Reporting and Litigation Support

## BRADFORD ASSOCIATES
## DONALD HINKLE

Page 10

1  have to do or were you studying to do?
2    A   It was automotive electric; electronics
3  and electric.
4    Q   Did you take any classes at this trade
5  school or elsewhere with respect to construction
6  work?
7    A   No.
8    Q   Did you take any classes in this trade
9  school or elsewhere with respect to electrical
10 work beyond the automotive context?
11   A   With my brother. He's an electrical
12 engineer and I worked under his license with him.
13   Q   Did you do that in this area or in
14 Chicago?
15   A   No, that was in West Virginia.
16   Q   Did you ever take any classes at this
17 trade school or elsewhere in the plumbing area?
18   A   No.
19   Q   What about in the carpentry area?
20   A   No.
21   Q   Do you hold any certificates or
22 licenses as an electrical contractor?

## BRADFORD ASSOCIATES
## DONALD HINKLE

Page 11

1    A   No.
2    Q   What about as a plumbing contractor?
3    A   No.
4    Q   What about as any kind of contractor?
5    A   No.
6    Q   Do you consider yourself to have
7  special skills as a carpenter?
8    A   Yes.
9    Q   What kind of skills do you have as a
10 carpenter?
11   A   Just over the years, I've built a few
12 homes; built a home for my brother. I've done
13 quite a bit. I've read all the codes in the
14 areas I was working in. I had it inspected and
15 everything.
16   Q   Did you need any licenses or permits in
17 order to build the house for your brother?
18   A   Well, in Virginia my brother held the
19 license. He was the homeowner.
20   Q   Other than building your brother's
21 house, have you ever built any other houses?
22   A   No -- well, I did the inside of my

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Exceptional Service in Court Reporting and Litigation Support

## BRADFORD ASSOCIATES
## DONALD HINKLE

Page 12

1  first house. I did all the inside, any
2  electrical in my first house.
3    Q   Any other particular experience you
4  have as a carpenter beyond building your
5  brother's house and doing some of the inside work
6  at your house?
7    A   No, I guess that would be it.
8    Q   Do you have any special skills in the
9  electrical area; again, beyond the automotive
10 context?
11   A   Well, yes, I put in electric mains and
12 I have pulled circuits. Like I said, I've read
13 the codes book for each area I work in.
14   Q   Did you ever train under a licensed
15 electrician?
16   A   Yes, my brother, he is an electrical
17 engineer.
18   Q   Have you ever been paid by anyone to do
19 electrical work?
20   A   Let's see. Yes, with Hal I have done
21 some.
22   Q   Have you ever been paid by anyone other

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Exceptional Service in Court Reporting and Litigation Support

## BRADFORD ASSOCIATES
## DONALD HINKLE

Page 13

1  than Mr. Walls to do electrical work?
2    A   No.
3    Q   Have you ever been paid by anyone to do
4  carpentry work?
5    A   Carpentry work, yes. Let's see. I
6  guess Hal paid me.
7    Q   Anyone besides Mr. Walls?
8    A   No.
9    Q   Do you have any special skills in the
10 plumbing area?
11   A   Well, I've done complete plumbing jobs.
12 Like I said, at my first home, and the home that
13 I built for my brother, I did the complete
14 plumbing jobs on them.
15   Q   Have you ever been paid by anyone to do
16 plumbing work for them?
17   A   Just Hal.
18   Q   Is your plumbing experience limited to
19 the plumbing work you did in your brother's house
20 and the plumbing work you've done on our own
21 homes?
22   A   Well I worked for Hunting Towers, too,

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Exceptional Service in Court Reporting and Litigation Support

## BRADFORD ASSOCIATES
## DONALD HINKLE

Page 14

1  I did plumbing for them.
2      Q   What is Hunting Towers?
3      A   That is high rise apartments in Old
4  Town, they have them right on the main street in
5  Old Town, I forget the address.
6      Q   That's okay. I mean, were you working
7  under a licensed plumber?
8      A   Yes, we worked under the main engineer
9  there, on his license.
10     Q   So you were doing work pursuant to his
11 instructions or her instructions?
12     A   Yes.
13     Q   Any other training or experience in
14 either carpentry, electrical work, or plumbing
15 work that you haven't told me about?
16     A   That covers it.
17     Q   Are you currently employed by anyone?
18     A   No.
19     Q   When was the last time you were
20 employed by anyone?
21     A   Well, I guess it would have been
22 Hunting Towers would be my last employment.

## BRADFORD ASSOCIATES
## DONALD HINKLE

Page 15

1      Q   When was that?
2      A   I just worked for them for about ninety
3  days in 1985, I believe.
4      Q   And prior to that?
5      A   I worked for Sears for thirteen years.
6      Q   What kind of work did you do for Sears?
7      A   I was manager for two departments.
8      Q   Which two departments?
9      A   Let's see. That would 190 and 95, that
10 would be tires and automotive.
11     Q   When you say Hunting Towers, would that
12 be Hunting, H-u-n-t-i-n-g Towers?
13     A   Hunting.
14     Q   Hunting like shooting animals hunting?
15     A   I believe that's it.
16     Q   And prior to managing two departments
17 at Sears, where did you work before that?
18     A   I think I worked for my uncle in the
19 transmission business.
20     Q   Is most of your experience in the
21 automotive area?
22     A   I would say about fifty-fifty, half of

## BRADFORD ASSOCIATES
## DONALD HINKLE

Page 16

1  it there and half is in, you know, carpentry and
2  electrical work.
3      Q   When you say that fifty percent of your
4  experience is in carpentry and electrical, other
5  than Mr. Walls have you ever done work for
6  anybody else that paid you for any of that type
7  of work?
8      A   No, not really. I guess that's about
9  it. Like I said, I built a house for my brother.
10     Q   Are you currently retired?
11     A   Disabled.
12     Q   When you say disabled, is that a
13 self-assessment, or an assessment that has been
14 made by a government agency like the Social
15 Security Administration?
16     A   No, none of them. Just myself, just
17 myself.
18     Q   Have you been disabled since
19 approximately 1985?
20     A   Pretty much, yes.
21     Q   So how do you sustain yourself?
22     A   Well, my mother and father helped me

## BRADFORD ASSOCIATES
## DONALD HINKLE

Page 17

1  before I got married; and, my wife is the main
2  breadwinner for the household.
3      Q   Since 1985, have you done work for
4  others for pay?
5      A   I've done a little bit, like I said, on
6  the outside, maybe helping a neighbor or
7  something like that, but -- or helping someone in
8  the family.
9      Q   How much money would you say you
10 have made, say, from 2000 to the present doing
11 work for neighbors or friends?
12         MR. JOHNSON: Including Mr. Walls or
13 other than Mr. Walls?
14         BY MR. COX:
15     Q   Yes, including Mr. Walls.
16     A   I couldn't really say. There was never
17 any paperwork. Maybe over all those years,
18 between everybody, maybe $10,000 or something like
19 that.
20     Q   So $10,000, approximately, from 2002 to
21 the present?
22     A   Yes.

## BRADFORD ASSOCIATES
## DONALD HINKLE

Page 18

1   Q   And of that $10,000, can you tell me
2   how much of that would be attributable to work
3   that you had done for Mr. Walls?
4       A   It would be most of that.
5       Q   When --
6       A   I'm just really guessing at that. It
7   could even be less than that or it could be a
8   little more; I don't really know. but it's just
9   a good guess.
10      Q   You don't have any records that would
11  establish that or not?
12      A   No, no records. It was all cash. A
13  few checks, mostly cash.
14      Q   Do you advertise to do work
15  for others in any particular area?
16      A   No.
17      Q   Do you work in just Virginia, or do you
18  work beyond sort of the Alexandria area?
19      A   Actually, most of his stuff is in
20  D.C., everything he has.
21      Q   When did you first meet Mr. Walls?
22      A   It was in 1999, I believe.

## BRADFORD ASSOCIATES
## DONALD HINKLE

Page 19

1       Q   Was that when you moved to the
2   neighborhood in which he lives?
3       A   He moved in. I already lived there.
4   I've been there since '88.
5       Q   How close, geographically, do you live
6   to him?
7       A   Two doors from him.
8       Q   Would you consider yourself friends
9   with Mr. Walls?
10      A   Yes.
11      Q   Close friends with Mr. Walls?
12      A   Not necessarily close, but friends.
13      Q   Do you know Mrs. Walls?
14      A   Yes.
15      Q   Is that Barbranda?
16      A   Yes.
17      Q   What type of relationship, if any, do
18  you have with Barbranda Walls?
19      A   None.
20      Q   Has she ever been involved in any of
21  the work that you've done for Mr. Walls?
22      A   (Witness indicates in the negative.)

## BRADFORD ASSOCIATES
## DONALD HINKLE

Page 20

1       Q   Is that a no?
2       A   No. I'm sorry.
3       Q   In what context did you meet Mr.
4   Walls; was it simply his coming to the
5   neighborhood or something more specific than that?
6       A   He was working on his house and it was
7   just casual, I just walked up and introduced
8   myself.
9       Q   Just a neighborly introduction?
10      A   Yes, a neighborly introduction.
11      Q   At some point did you begin doing work
12  for Mr. Walls?
13      A   Yes.
14      Q   How did that come about?
15      A   He would either ask me for advice, or
16  he would ask me if I could do something for him;
17  and, I would let him know if I could or couldn't.
18  Sometimes I could, and sometimes I couldn't, it
19  would depend on my health issue.
20      Q   Did you begin doing work for him in
21  1999?
22      A   Yes, some work.

## BRADFORD ASSOCIATES
## DONALD HINKLE

Page 21

1       Q   So you said that at times he would just
2   ask for advice, and other times he would actually
3   ask you to do something for him?
4       A   Well, depending on what I could do I
5   would let him know, you know, if I felt I was
6   able to do it, I would do it. A lot of times I
7   wasn't able to do it and he would have to go get
8   somebody else.
9       Q   When you say you weren't able to do it,
10  can you give me an example of certain things in
11  which you wouldn't have been able to do the work?
12      A   It depends on my hypertension. If my
13  blood pressure was too high or if I didn't feel
14  right, I wouldn't do nothing.
15      Q   I know that when we first tried to set
16  up these depositions in December, you weren't
17  feeling very well. Are you feeling better today?
18      A   Yes.
19      Q   Are you on any medications or anything
20  that would prevent you from either understanding
21  my questions or answering truthfully?
22      A   No, just all blood pressure medicine.

## BRADFORD ASSOCIATES
## DONALD HINKLE

Page 22

1  Q  Did you have any written contracts with
2  Mr. Walls with respect to any of the work you've
3  ever done for him?
4     A  No, nothing on paper. It was always,
5  mostly cash.
6     Q  Has he ever issued you a 1099 in
7  connection with the money that he paid you?
8     A  No.
9     Q  Did you ever ask for a 1099?
10    A  No.
11    Q  Did he ever ask you whether you wanted
12 a 1099?
13    A  No.
14    Q  Did you ever fill out any W-2s for Mr.
15 Walls?
16    A  No.
17    Q  Did you ever have any discussion with
18 Mr. Walls as to whether you were an employee or
19 an independent contractor with respect to the
20 work that you did for him?
21    A  No. He had me sign a paper stating I
22 was an independent contractor at one time, but I

## BRADFORD ASSOCIATES
## DONALD HINKLE

Page 23

1  told him because we never -- I never applied
2  for a business license or anything that, you know
3  what I mean, it wasn't -- like it wasn't a
4  business.
5     Q  I'm not sure that I follow that
6  exactly, but let me ask you, first, when was
7  it that Mr. Walls asked you to sign a piece of
8  paper?
9     A  It was a couple of years ago.
10    Q  In what context did that arise?
11    A  He told me just over his liabilities he
12 just needed someone to sign.
13    Q  Did this come out of the blue or was
14 there a specific circumstance that led to the
15 conversation?
16    A  There was nothing, no.
17    Q  So he asked you to sign a piece of
18 paper that said that you were an independent
19 contractor?
20    A  Yes.
21    Q  Do you remember if the paper was in
22 writing or typed?

## BRADFORD ASSOCIATES
## DONALD HINKLE

Page 24

1     A  It was typed.
2     Q  Do you know who prepared the letter?
3     A  No, I don't know.
4     Q  Did you sign the letter?
5     A  Yes.
6     Q  Do you remember what the letter said?
7     A  It stated that I was just an
8  independent contractor. It was real simple, he
9  just had me sign it.
10    Q  Did it say anything more than that?
11    A  No.
12    Q  So your recollection is that it was one
13 sentence?
14    A  Yes, it was just real simple, real
15 short.
16    Q  Did you date the letter?
17    A  Yes, I think it was dated.
18    Q  Did he sign the letter?
19    A  I didn't see him sign it, no.
20    Q  Where did he present you the letter?
21    A  One morning he just brought it out.
22    Q  At his house, your house, or somewhere

## BRADFORD ASSOCIATES
## DONALD HINKLE

Page 25

1  else?
2     A  At his house. He just brought it
3  outside. I believe I signed it at his truck.
4     Q  Did you have any concern then or at any
5  time as to whether you were an employee or
6  independent contractor of his?
7     A  I felt neither. I mean, I wasn't in
8  business; and, like I said, the little bit of
9  work I did do for him, I didn't consider that
10 being in business. It was more like a neighbor
11 asking you to do something and he pays you a few
12 dollars for doing it; that's the way it was with
13 me.
14    Q  From the time you first began doing
15 work for Mr. Walls in 1999 to the present, have
16 you worked for anybody else besides him?
17    A  No.
18    Q  Other than this piece of paper that you
19 just talked about that Mr. Walls presented to
20 you, have you and he ever had any other
21 discussions about whether you were an employee
22 or an independent contractor?

BRADFORD ASSOCIATES
DONALD HINKLE

Page 26

1  A  No.
2  Q  Do you know a man named Vincent Edwards?
3  A  Yes.
4  Q  Was he a gentleman that was present on
5  the day of your fall?
6  A  Yes.
7  Q  Had you worked with Mr. Edwards before
8  that day?
9  A  Just a couple of times.
10 Q  Did Mr. Edwards have a particular skill
11 set, things that he could do better than other
12 things that you're aware of?
13 A  No.
14 Q  On the couple of occasions, did you
15 actually say you worked with him on a couple of
16 occasions?
17 A  Yes.
18 Q  What kind of work were you doing when
19 he worked with you?
20 A  Let's see. Removing a back wall, he
21 was supposed to be removing it. I looked it over
22 and stopped him because the house was condemned.

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Exceptional Service in Court Reporting and Litigation Support

BRADFORD ASSOCIATES
DONALD HINKLE

Page 27

1  So I told him he had to stop. So that was the
2  end of that.
3  Q  Do you know how often he worked
4  for Mr. Walls?
5  A  He only worked for him a couple of
6  times, I guess, just right then when I met him,
7  like two days I had seen him, maybe.
8  Q  When was the last time that you talked
9  to him?
10 A  Just from the roof.
11 Q  That was the last time you saw him?
12 A  Yes.
13 Q  Do you know where he is now?
14 A  I was just telling my lawyer here that
15 I thought he was killed. I thought I had seen
16 his name on the news. He was a drug addict.
17 Q  Do you know where he lived at the time
18 of your fall in August, 2005?
19 A  No. I only knew him by Vince. I
20 didn't know his last name.
21 Q  From 1999 forward which will be the
22 time frame I'll talk about now, basically, the

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Exceptional Service in Court Reporting and Litigation Support

BRADFORD ASSOCIATES
DONALD HINKLE

Page 28

1  time frame that you were working with Mr. Walls.
2  How frequently did you work with him?
3  A  It's hard to say. It could be once a
4  week, sometimes; and, then, other times I could
5  go a couple of months and not even talk to him.
6  Q  At the time that he was asking you to
7  do work for him, do you know whether he was
8  asking others to do work for him, other than Mr.
9  Edwards?
10 A  Yes, he had other people working
11 for him.
12 Q  Do you know a gentleman named Robert
13 Edison?
14 A  Yes.
15 Q  Do you know if he worked for Mr. Walls?
16 A  Yes.
17 Q  Do you know what kind of work he did
18 for Mr. Walls?
19 A  Plumbing.
20 Q  Did you ever work on any jobs with Mr.
21 Edison?
22 A  Yes.

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Exceptional Service in Court Reporting and Litigation Support

BRADFORD ASSOCIATES
DONALD HINKLE

Page 29

1  Q  Did you work on plumbing jobs with Mr.
2  Edison?
3  A  Yes.
4  Q  On those jobs, were you working under
5  Mr. Edison or taking instruction from him?
6  A  No.
7  Q  Did you work collaboratively together?
8  A  No, mostly, like I said, I was an
9  adviser, I told him how to do it to pass code.
10 Q  You told Mr. Edison how to do it to pass
11 code?
12 A  Yes.
13 Q  And that was based upon your reading of
14 the applicable codes?
15 A  Yes.
16 Q  Do you know a gentleman by the name of
17 Turpine Ward?
18 A  Yes.
19 Q  Did he, also, work for Mr. Walls?
20 A  Yes.
21 Q  Do you know what kind of work he did?
22 A  Carpentry.

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Exceptional Service in Court Reporting and Litigation Support

BRADFORD ASSOCIATES
DONALD HINKLE

Page 30

1  Q  Do you know whether Mr. Edison or Mr.
2  Ward had any licenses to do the work they did?
3  A  No.
4  Q  Did you ever work together
5  collaboratively with Mr. Ward?
6  A  Yes.
7  Q  Were you advising him, as well?
8  A  Yes.
9  Q  So in situations where Mr. Edison or
10 Mr. Ward were working with you, you actually
11 instructed them as opposed to them instructing
12 you?
13 A  Right. I would tell them what was code
14 and what wasn't.
15 Q  Did Mr. Walls always pay you for the
16 work that you did for him?
17 A  Yes.
18 Q  How did he pay you?
19 A  Mostly cash. A few checks, but mostly
20 cash.
21 Q  How was it determined how much money
22 you would get for working for him on any given

BRADFORD ASSOCIATES
DONALD HINKLE

Page 31

1  occasion?
2  A  I said, you know, it was like $15 an
3  hour, but he paid me for a day, no matter if it
4  was three hours or five hours, or whatever it was,
5  he paid me for the day.
6  Q  So how much would he pay you for a day?
7  A  $120.
8  Q  And that was irrespective of the number
9  of hours that you worked during any given day?
10 A  It didn't make any difference. It
11 could be three hours, it could have been nine
12 hours, it didn't make any difference.
13 Q  So if he asked you to do something on
14 any given day, he paid you $120?
15 A  Yes.
16 Q  Did he ever pay you by the project?
17 A  Maybe once.
18 Q  Do you recall the nature of the project
19 since it was only once?
20 A  No.
21 Q  Can you just describe for me,
22 generally, how an opportunity would arise for you

BRADFORD ASSOCIATES
DONALD HINKLE

Page 32

1  to work for Mr. Walls on any given occasion; how
2  would he come to you, what would happen? He
3  would call you, you would call him?
4  A  No, he would call me.
5  Q  Okay.
6  A  He would ask me about a problem and,
7  then, he would ask if I could or couldn't do it.
8  Q  Then, what would happen?
9  A  Either, like I said, I could; and, he
10 would ask me what day or time.
11 Q  Was the day and time up to you?
12 A  Yes, pretty much.
13 Q  Did he ever dictate what day or at what
14 time you had to work?
15 A  No.
16 Q  And the ongoing understanding was that
17 you would be paid $120 per day?
18 A  Yes.
19 Q  Where would you be doing this work, at
20 his properties?
21 A  Yes.
22 Q  And from '99 to the present, did you

BRADFORD ASSOCIATES
DONALD HINKLE

Page 33

1  have an understanding as to how many properties
2  he and his wife owned?
3  A  I never really knew. He didn't talk
4  too much about that.
5  Q  At how many different properties did
6  you work?
7  A  Eight, ten; maybe eight or ten
8  properties.
9  Q  Were they -- let me just ask you, where
10 were they?
11 A  In D.C.
12 Q  All in D.C.?
13 A  Yes.
14 Q  How would you normally get to the
15 properties?
16 A  I would drive there or he would take
17 me, depending on the parking situation.
18 Q  Did one of those happen more often than
19 another, either you driving or him taking you?
20 A  It was about fifty-fifty, I guess.
21 Q  Did you ever do any work for him out of
22 your house, did you bring any work home, work on

BRADFORD ASSOCIATES
DONALD HINKLE

Page 50

1   Q   Did you ever see or hear Mr. Walls
2   provide instruction or advice to anybody else?
3   A   Yes.
4   Q   Was the instruction or advice that he
5   provided to others different than the instruction
6   or advice that he provided to you?
7   A   It was more indepth. These people
8   didn't know a lot. So he had had to describe
9   pretty much in detail what he wanted from them.
10  Q   Did that include people like Robert
11  Edison and Turpine Ward?
12  A   Yes.
13  Q   Can you give me an example of plumbing
14  work that you have done for Mr. Walls?
15  A   Installed main line, main drain line,
16  main water lines. I put new services in.
17  Q   What does that mean?
18  A   Say new hot and cold lines running into
19  a new location.
20  Q   With respect to any of that work, what
21  kind of instruction or advice did Mr. Walls give
22  you, if any?

BRADFORD ASSOCIATES
DONALD HINKLE

Page 51

1   A   As far as that work, he could -- just
2   the type of fixture, because, see, I knew the
3   code on that. So that was my call.
4   Q   Would the same apply to any electrical
5   work that you've done for him?
6   A   Placement, yes, but not wire-size or
7   type of wire, or anything like that.
8   Q   Did you have any arrangement with Mr.
9   Walls that would have limited his ability to
10  terminate you or fire you, if he wanted to?
11  A   Did I have what, again?
12  Q   Did you have any sort of agreement or
13  understanding with Mr. Walls as to whether he
14  could fire you or terminate you whenever he felt
15  like it?
16  A   No.
17  Q   Was it your understanding that he could
18  terminate or fire you whenever he wanted to?
19  A   Pretty much.
20  Q   With respect to the day of your fall,
21  which I believe is --
22  A   Excuse me. Would this be a good time

BRADFORD ASSOCIATES
DONALD HINKLE

Page 52

1   to take like a three minute break?
2   Q   Yes, sure.
3       (Thereupon, a recess was taken.)
4       BY MR. COX:
5   Q   Before we actually get to the fall,
6   with respect to the frequency with which you did
7   work for Mr. Walls, can you give me a sense of
8   the number of occasions, say, during 2005 that
9   you worked for him before your fall?
10      MR. JOHSON: Just to clarify. You're
11  speaking, now, of days, or jobs, or weeks?
12      BY MR. COX:
13  Q   Yes, days.
14  A   Days. Like I said, it could maybe
15  average one day a week.
16  Q   When you say average, is that because
17  some weeks you might actually work more than
18  that and other weeks you would work not at all?
19  A   I would go a month without hearing from
20  him.
21  Q   Was there a particular time of the
22  year where you worked more so for Mr. Walls than

BRADFORD ASSOCIATES
DONALD HINKLE

Page 53

1   at another time of year?
2   A   No, it didn't seem to make any
3   difference.
4   Q   It just depended upon his need?
5   A   Yes.
6   Q   When you say an average of one day per
7   week for 2005, would the same apply to the years
8   from 1999 to 2005?
9   A   Yes, about the same.
10  Q   With respect to the day of your fall,
11  which I believe was August 29th, 2005; is that
12  your recollection of the date?
13  A   Yes, 8-29-05, my birthday.
14  Q   Were you working for Mr. Walls that day?
15  A   No.
16  Q   You were not. Were you doing anything
17  for Mr. Walls that day?
18  A   No.
19  Q   At some point during the day were you
20  at property owned by Mr. Walls or his wife?
21  A   Was I at the property?
22  Q   Yes.

BRADFORD ASSOCIATES
DONALD HINKLE

Page 54

1   A   Yes.
2   Q   How did it come to be that you were at
3   a property owned by him or his wife?
4   A   Hal asked me -- he didn't trust Vincent
5   for measuring the skylight on this roof at Abbey
6   and he asked me to measure it for him. He was
7   going to have Vincent put on it, but he didn't
8   trust Vincent's measurements or anything. He
9   wanted to make sure he got the right size, the
10  right skylight.
11       Like I said, I remember it so well
12  because it was my birthday, plus I could
13  never forget the injuries.
14  Q   Had he asked you to come measure the
15  skylight that day --
16  A   Yes.
17  Q   -- or had arrangements been made on a
18  prior day?
19  A   That day.
20  Q   Beyond doing the measurements, were you
21  doing anything else at that property?
22  A   No.

BRADFORD ASSOCIATES
DONALD HINKLE

Page 55

1   Q   And just so we're clear for the record,
2   is the property located at 1117 Abbey Place in
3   D.C.?
4   A   Yes.
5   Q   Was Mr. Walls going to pay you for the
6   work that day?
7   A   No.
8   Q   Have you ever told Erie that it was
9   your understanding you were going to be paid for
10  the work that day?
11  A   No, I didn't expect to be paid for it.
12  I thought it was just another advice day. I told
13  him I wouldn't work that day, it was my birthday.
14  Q   What changed your mind?
15  A   Because he said he just wanted me to
16  measure it and we would get right back home.
17  Q   How long were you actually at the
18  property before you fell?
19  A   Just maybe ten minutes.
20  Q   So it was your understanding that it
21  was going to be a quick turn-around?
22  A   Yes.

BRADFORD ASSOCIATES
DONALD HINKLE

Page 56

1   Q   How did you get to the property?
2   A   He drove me.
3   Q   Was it just the two of you?
4   A   Well, we stopped and picked up Vincent
5   at one of his other properties.
6   Q   What happened once you got there?
7   A   We just went through the house. He set
8   up the ladder out back.
9   Q   When you say he, who are you referring
10  to?
11  A   To Hal. Then, he held the bottom and
12  Vince went up first, I went up second, we were on
13  the roof of the porch. He brought the ladder up
14  to the second story; and, then, they held
15  the ladder -- Vincent went up. Then, he held the
16  ladder on the bottom and top for me and, then, I
17  went up. When I got to the top, that's when the
18  gutter caved in, the ladder moved; and, then, I
19  fell over backwards and fell down.
20  Q   When you say that he was holding the
21  top and the bottom.
22  A   Vincent was at the top, he climbed up

BRADFORD ASSOCIATES
DONALD HINKLE

Page 57

1   first and Hal was at the bottom.
2   Q   The bottom of the ladder was on the
3   first story roof?
4   A   Yes, the first story roof.
5   Q   Whose ladder was it?
6   A   Hal's.
7   Q   Did you bring any tools or supplies
8   to the property?
9   A   No.
10  Q   Did Mr. Edwards?
11  A   No.
12  Q   Were any tools or supplies required in
13  connection with the work that was going to be
14  done that day?
15  A   I don't know. I didn't -- whatever Hal
16  had said to Vincent, I don't know what he said to
17  him, what he needed or if he needed anything.
18  Q   Had Mr. Walls already purchased the
19  skylight before you went to the property?
20  A   No, that's why I had to measure it. He
21  asked me to measure it so we made sure he got the
22  right size. He didn't trust Vincent's judgment