IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ERIE INSURANCE EXCHANGE, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : Civil Action No. |
| | : 1:06CV00573 -- DAR |
| HAL WALLS et al., | : |
| | : |
| Defendants. | : |

# Exhibit 2 to Defendant Donald K. Hinkle's Statement of Material Facts as to Which There is No Dispute

# Excerpts of Deposition of Hall Walls

Page 1

# U.S. STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

ERIE INSURANCE EXCHANGE, )
    Plaintiff, )
v. ) Case No.:
HAL WALLS, et al., ) 06-CV-573-ESH
    Defendants. )

Deposition of:

    HAL WALLS, JR.,

Taken on behalf of the Plaintiff, at the Law Offices of Koonz, McKenney, Johnson, DePaolis & Lightfoot, James Monroe Building, 2001 Pennsylvania Avenue, N.W., Suite 450, Washington, D.C., commencing at 10:20 a.m., Wednesday, January 10, 2007, before Toni R. DeSenze.



BRADFORD ASSOCIATES
HAL WALLS

Page 6

1  you don't understand a question, let me know, and I'll
2  try to rephrase it. If you don't tell me that you
3  don't understand, I'll assume that you do understand;
4  is that okay?
5      A   Okay.
6      Q   If at any point in time I ask a question
7  that permits a yes or no response, if you could
8  actually verbalize the yes or no, as opposed to
9  shaking or nodding your head, that would help me and
10 the court reporter.
11     A   Very well.
12     Q   And if you need to take a break, just let me
13 know.
14         How long have you lived on Alforth Avenue in
15 Alexandria?
16     A   I lived there approximately nine years.
17     Q   Do you live there with your wife?
18     A   Yes.
19     Q   Is her name Barbranda Walls?
20     A   Yes. B-A-R-B-R-A-N-D-A.
21     Q   As you know, I represent Erie Insurance
22 Exchange in this insurance coverage litigation that's

BRADFORD ASSOCIATES
HAL WALLS

Page 7

1  pending in the Federal Court in D.C. Were you and
2  your wife served with a copy of the Complaint in that
3  matter?
4      A   Yes.
5      Q   Did you both decide not to file an answer in
6  that case?
7      A   Yes.
8      Q   When is your date of birth?
9      A   October 2, 1948.
10     Q   Did you do anything in preparation for this
11 deposition?
12     A   No.
13     Q   Have you ever spoken to --
14     A   The only thing I might have done is I
15 prepared a production of documents sometime ago, but I
16 forgot what that was.
17     Q   At any point in time, have you spoken to
18 Mr. Johnson or Mr. Cohen regarding the incident with
19 Mr. Hinkle from August of 2005?
20     A   I don't think so. This is my first time
21 meeting Mr. Johnson.
22     Q   Can you tell me a little bit about your

BRADFORD ASSOCIATES
HAL WALLS

Page 8

1  educational background just from high school forward?
2      A   I went to University of Missouri, St. Louis
3  University, and Howard University.
4      Q   Did you get a degree from the University of
5  Missouri?
6      A   Yes.
7      Q   What was that in?
8      A   That was in finance.
9      Q   Did you go to Howard for graduate work?
10     A   No. Law school.
11     Q   Do you have a J.D.?
12     A   Yes.
13     Q   Are you a practicing lawyer?
14     A   No.
15     Q   Have you ever practiced law?
16     A   Yes.
17     Q   How long ago?
18     A   About ten years ago.
19     Q   What area?
20     A   Personal injury.
21     Q   Did you practice on your own, or were you
22 affiliated with a firm?

BRADFORD ASSOCIATES
HAL WALLS

Page 9

1      A   I practiced with my deceased wife.
2      Q   Did you practice under a firm name?
3      A   Walls & Walls.
4      Q   How long did you practice?
5      A   About 20 years.
6      Q   Was your practice exclusively personal
7  injury work?
8      A   No. It was a general practice but,
9  primarily, personal injury.
10     Q   So did you stop practicing law approximately
11 in 1996?
12     A   Nineteen-ninety-five.
13     Q   Have you worked since '95?
14     A   No, just on-and-off jobs.
15     Q   What kinds of jobs?
16     A   Investment, entrepreneurial ventures for
17 myself.
18     Q   Is your wife employed?
19     A   She's like a contract worker and freelance
20 writer, editor.
21     Q   Is her contract work also in the writing
22 area?

BRADFORD ASSOCIATES
HAL WALLS

Page 14

1  possession?
2     A   I can't say. I'm still looking for
3  paperwork regarding the matter. I will update the
4  interrogatories accordingly.
5     Q   What things are you looking for?
6     A   Anything that comes -- you asked for
7  receipts. You asked for a lot of things, all of the
8  things that you asked for that's not presented,
9  including tax returns, which are not yet prepared, but
10 when I prepare them, I will give them to you.
11    Q   I'm going to ask you, then, specifically
12 about some of these requests so I can find out whether
13 you think these documents actually exist and you just
14 don't have them. One of the requests is for
15 "Contracts, agreements, proposals, and estimates
16 between you and Donald Hinkle at any time"?
17    A   No. We never had any contracts to do any
18 work.
19    Q   So there are no documents responsive to that
20 request?
21    A   No. We never sat down and wrote out
22 contracts or had any written paperwork, proposals,

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Exceptional Service in Court Reporting and Litigation Support

BRADFORD ASSOCIATES
HAL WALLS

Page 15

1  plans, nothing like that.
2     Q   So there would be no documents memorializing
3  any work that Mr. Hinkle ever did for you?
4     A   No.
5     Q   The next request asks for --
6     A   Correction. Like I said, I did pay them
7  several times with checks, so if that constitutes a
8  document, then, that could be used to memorialize
9  work. As far as construction, contracts, agreements,
10 proposals, there are none of those.
11    Q   I believe you said, with respect to any
12 checks that you may have paid Mr. Hinkle with, you
13 don't have those in your possession?
14    A   No. The checking account, they don't send
15 you checks. You have to pay for those checks.
16    Q   How often did you pay Mr. Hinkle with
17 checks?
18    A   I don't know exactly. Maybe -- it's hard to
19 say. It's been over a long period of time, so I would
20 say, most of the time, I paid him in cash and,
21 recently, nothing because he hadn't done anything for
22 me.

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Exceptional Service in Court Reporting and Litigation Support

BRADFORD ASSOCIATES
HAL WALLS

Page 16

1     Q   The next request is "Contracts, agreements,
2  proposals, and estimates between you and Vincent
3  Edwards." Were there any documents that memorialize
4  any work Mr. Edwards did for you?
5     A   No. I might have written a couple checks
6  for him also.
7     Q   How often did you pay him with checks?
8     A   Not that often. If I recall correctly, he
9  didn't have a checking account, so, most of the time,
10 I paid him in cash. Additionally, he did not work for
11 me very long.
12    Q   The next one is for "forms, W-2 W-4, or 1099
13 relating to either Mr. Hinkle or Mr. Edwards." Did
14 any of those documents exist?
15    A   No.
16    Q   Did they ever exist?
17    A   No.
18    Q   The next one, which overlaps a little bit
19 with one we just talked about, are "Documents
20 evidencing or referring or relating to work performed
21 or services performed by Mr. Hinkle for you or your
22 wife on August 29, 2005," which is the date of this

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Exceptional Service in Court Reporting and Litigation Support

BRADFORD ASSOCIATES
HAL WALLS

Page 17

1  incident. Are there any documents related to any work
2  that was done by Mr. Hinkle on that date?
3     A   No.
4     Q   Did any of those documents ever exist?
5     A   No.
6     Q   The next request is with the same kind of
7  documents, but with respect to Vincent Edwards. Are
8  there any documents related to the work that
9  Mr. Edwards did for you on August 29, 2005?
10    A   No.
11    Q   Did those documents ever exist?
12    A   What date was that?
13    Q   August 29, 2005?
14    A   No, no documents.
15    Q   They never existed?
16    A   No. There's no written documents to
17 evidence any of that situation.
18    Q   The next several questions are more specific
19 at times with respect to "any documents related to any
20 work that Vincent Edwards or Donald Hinkle did for you
21 at any time," and other than the checks that you
22 mentioned, are there any other documents that would

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Exceptional Service in Court Reporting and Litigation Support

BRADFORD ASSOCIATES
HAL WALLS

Page 22

1  at all times, the work he done with me would be as an
2  independent contractor, not an employee.
3      Q   Did you ever file any claim with any
4  worker's compensation commission arising out of this
5  occurrence?
6      A   No.
7      Q   Do you know if anyone else ever filed any
8  claim with any worker's compensation commission as a
9  result of this occurrence?
10     A   I have no knowledge of someone else filing
11 such a claim.
12     Q   Request No. 17 asks for "Documents that you
13 contend support any contention that there's coverage
14 under your landlord policy with Erie." Are you aware
15 of any such documents?
16     A   No, I'm not aware of any documents that
17 would support the contention other than the policy,
18 what's written in the policy itself.
19     Q   Request No. 18 asks for "Documents received
20 from you by Erie, Mr. Hinkle, Mr. Edwards, or anybody
21 related to the occurrence," and I believe you produced
22 a couple of letters from Erie. Are you aware of any

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Exceptional Service in Court Reporting and Litigation Support

BRADFORD ASSOCIATES
HAL WALLS

Page 23

1  other documents that you received from Mr. Hinkle,
2  Mr. Edwards, or anyone else relating to the
3  occurrence?
4      A   There might be something from Erie, but I
5  don't have anything from Vincent Edwards or
6  Mr. Hinkle. In fact, I haven't seen Mr. Edwards, I
7  believe, since the occurrence. It's been a long, long
8  time.
9      Q   Request No. 19 asks for "Notices sent by you
10 to Erie, Mr. Hinkle, or Mr. Edwards relating to the
11 occurrence." Did you ever send notices to anyone
12 relating to this occurrence?
13     A   No. Erie called me the day I received
14 notice from Mr. Hinkle's attorney, so at that point, I
15 did not bother with a notice because he had a notice
16 already.
17     Q   It's your understanding that notice of the
18 occurrence was provided to Erie by Mr. Hinkle?
19     A   Right.
20     Q   The last request is for "Documents referring
21 or relating to whether those performing work for you
22 were either employees or independent contractors," and

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Exceptional Service in Court Reporting and Litigation Support

BRADFORD ASSOCIATES
HAL WALLS

Page 24

1  you've indicated none. Are there any documents that
2  you believe establish that either Mr. Hinkle or
3  Mr. Edwards were either an employee or independent
4  contractor?
5      A   I'm still checking on documents for that,
6  because it was my understanding, between me and
7  Mr. Hinkle, he was at all times an independent
8  contractor for whatever work he did, but with respect
9  to the incident on August 29, he really wasn't
10 working. He just came there as a friend to take a
11 look at the job and advised me. I wasn't paying him
12 to do anything. He wasn't going to fix the roof or do
13 anything, but just take a look.
14     Q   You just said it was your understanding that
15 Mr. Hinkle was an independent contractor when he was
16 doing work for you?
17     A   Right.
18     Q   Why is that?
19     A   Because that's what we had agreed to in
20 principle, basically, orally.
21     Q   When did you strike that agreement?
22     A   Day one.

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Exceptional Service in Court Reporting and Litigation Support

BRADFORD ASSOCIATES
HAL WALLS

Page 25

1      Q   When was day one?
2      A   I don't know. It's hard to say. It might
3  have been four, five years ago.
4      Q   Was it when he first started doing work for
5  you?
6      A   Yes.
7      Q   I think you said that you moved into your
8  Alforth Avenue property approximately nine years ago?
9      A   Uh-huh.
10     Q   At the time you moved in, was Mr. Hinkle
11 living in that neighborhood?
12     A   Yes. He was already in.
13     Q   How long after you moved into that
14 neighborhood did Mr. Hinkle start doing work for you?
15     A   I don't recall exactly. It might have been
16 three years or so. It wasn't immediately.
17     Q   With respect to this agreement, this oral
18 agreement that you say was struck four or five years
19 ago, where was it struck?
20     A   I don't recall the facts and circumstances.
21 It might have been just during regular conversation.
22     Q   How did the conversation come up about

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Exceptional Service in Court Reporting and Litigation Support

BRADFORD ASSOCIATES
HAL WALLS

Page 26

1  whether he would be an independent contractor?
2     A  I don't recall the specifics. I'm saying it
3  could have been during a regular conversation. I
4  don't know. It's my understanding, at all times, when
5  I was dealing with him, he was independent and not an
6  employee.
7     Q  I understand that's your understanding. I'm
8  trying to figure out why it's your understanding, and
9  I think you've said that you had an oral agreement
10  with him, and I'm trying to find out when that was
11  struck and when that was said.
12     A  I don't know the exact date or year, but
13  from the beginning, we operated on the principle, on
14  that principle that I didn't control him. He did what
15  he wanted to do -- not what he wanted to do. He
16  worked when he worked. He couldn't work at all times,
17  and I didn't have work for him at all times, so he
18  wasn't an employee, and he would take care of his
19  taxes, and I would take care of my taxes.
20     Q  Was there a conversation in which you
21  specifically said to Mr. Hinkle that he would be an
22  independent contractor while working for you?

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Exceptional Service in Court Reporting and Litigation Support

BRADFORD ASSOCIATES
HAL WALLS

Page 27

1     A  Yes. This is during our conversation. He
2  knew what an independent contractor was, and I know
3  what an independent contractor was, so that was our
4  understanding.
5     Q  You actually used the term independent
6  contractor with him?
7     A  Right.
8     Q  Was this in one particular conversation?
9     A  Yes. We had several conversations.
10    Q  You had several conversations about whether
11  he was an employee or independent contractor?
12    A  Yes.
13    Q  Why was that?
14    A  Because when different situations arise, we
15  might talk about it sometime. When other people were
16  on the job, I would let them know they were
17  independent contractors just like Mr. Hinkle was. I
18  wasn't paying workmen's compensation. I'm not in the
19  business of taking out your taxes, filing your taxes.
20  This was the deal, so he would be privy to that
21  conversation also.
22    Q  What situations arose that the issue of

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Exceptional Service in Court Reporting and Litigation Support

BRADFORD ASSOCIATES
HAL WALLS

Page 28

1  whether Mr. Hinkle was an employee or independent
2  contractor came up?
3     A  Nothing specifically. Like I said, there
4  wasn't no injury or nothing like that. Usually, it
5  might be in general conversation. If I have another
6  person I picked up to work for me, I might explain
7  that to him, and Mr. Hinkle might be privy to that
8  conversation.
9     Q  It wasn't necessarily a conversation with
10  Mr. Hinkle. It may have been conversations with
11  others that Mr. Hinkle may have overheard?
12    A  That's correct.
13    Q  So back to my original question: Did you
14  discuss with Mr. Hinkle on more than one occasion,
15  Mr. Hinkle himself, that he was an independent
16  contractor?
17    A  To the extent I discussed it with other
18  people, I would say yes. In other words, he heard
19  that conversation, so we were talking loud enough that
20  you're addressing that person also.
21    Q  On how many other occasions was Mr. Hinkle's
22  status as an independent contractor discussed?

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Exceptional Service in Court Reporting and Litigation Support

BRADFORD ASSOCIATES
HAL WALLS

Page 29

1     A  I don't recall exactly, Counsel. It might
2  have been several.
3     Q  Do you remember any of those conversations
4  in particular?
5     A  No.
6     Q  Do you remember anything you specifically
7  said in any of those conversations?
8     A  No. It wasn't like there was an incident or
9  something that would have been memorialized. There
10  was no injury or nothing to that effect that would
11  cause me to remember something of that nature.
12    Q  Do you remember anything Mr. Hinkle
13  specifically said during any of those conversations?
14    A  No, nothing than I've already said, that he
15  would be responsible for his end, and I'd be
16  responsible for my taxes. I wasn't going to take out
17  anything on him. He would take out his -- take care
18  of his taxes, be it social security income or
19  whatever.
20    Q  So you had a specific conversation with
21  Mr. Hinkle during which you discussed the tax issue?
22    A  This is the same conversation I was telling

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Exceptional Service in Court Reporting and Litigation Support

BRADFORD ASSOCIATES
HAL WALLS

Page 34

1  A  He'd do handyman stuff.
2  Q  Is painting something you yourself had done?
3  A  Yes.
4  Q  Had you done a bit of painting?
5  A  No. I haven't done a lot of anything other
6  than practice law.
7  Q  Any particular reason you were having
8  Mr. Edwards do painting for you rather than doing it
9  yourself?
10  A  Yes. I wanted the get it done, and I didn't
11  have time to do it myself.
12  Q  You said that you explained to Mr. Edwards
13  that he was a day worker. Did you explain that to him
14  before he began doing work for you?
15  A  Yes.
16  Q  What does the term day worker mean to you?
17  A  It means I give them so much money per day,
18  period, paragraph. That's it. There's no guarantee
19  that I will work for you tomorrow or the next day or
20  ever, and it's your money; take it and go.
21  Q  Did you explain that to Mr. Edwards, that
22  there was no guarantee that he would work for you on

BRADFORD ASSOCIATES
HAL WALLS

Page 35

1  any other occasion other than the particular day for
2  which he was being paid?
3  A  No, I didn't put it in those terms. I just
4  told him I wanted to paint this, and he said he could
5  do it. I told him do it, and I'll let him know if I'm
6  satisfied with it. If I'm satisfied, keep on
7  painting. If not, that will be the end of that.
8  Q  During the 20 years that you practiced law,
9  did you ever have occasion to deal with the legal
10  issue of whether somebody was an employer or
11  independent contractor?
12  A  No more than case study. I didn't have a
13  case in my office regarding that matter.
14  Q  So you never came across an issue about
15  whether or not a particular employee was working
16  within the scope of his employment in any of your
17  personal injury cases?
18  A  I might have done that during the scope of
19  employment.
20  Q  Have you done any legal research about the
21  difference between an employee and independent
22  contractor in connection with this case?

BRADFORD ASSOCIATES
HAL WALLS

Page 36

1  A  No.
2  Q  The property located at 1117 Abby Place,
3  Washington, D.C., who owns that property?
4  A  My wife, Barbranda Walls.
5  Q  Is it a rental property?
6  A  Yes, it is.
7  Q  How long has she owned it?
8  A  I guess about five, six years.
9  Q  Do either you or your wife own any other
10  rental properties?
11  A  My wife does.
12  Q  How many does she own?
13  A  In the D.C. area, we have about four.
14  Q  Did you also have four in D.C. in
15  approximately August of 2005?
16  A  Yes.
17  Q  Other than the four in D.C., do you own any
18  others, you or she?
19  A  We have several properties in Baltimore.
20  Q  When you say "several," what do you mean by
21  that?
22  A  Several of our own properties, maybe about,

BRADFORD ASSOCIATES
HAL WALLS

Page 37

1  right now, I think, about ten.
2  Q  Any properties in Virginia or anywhere else?
3  A  A home that's located in Virginia, but not a
4  rental property.
5  Q  So, in total, there are approximately 14
6  rental properties?
7  A  Yes.
8  Q  Are all of the rental properties in your
9  wife's name?
10  A  Yes.
11  Q  Do you consider the purchase and leasing of
12  rental properties to be a side business of you and
13  your wife?
14  A  Yes, investment.
15  Q  Do you keep separate records with respect to
16  each property?
17  A  Not really. They're altogether.
18  Q  Do you generate a profit from these rental
19  properties?
20  A  No, not recently.
21  Q  At some point, did you?
22  A  No.

BRADFORD ASSOCIATES
HAL WALLS

Page 38

1  Q  So the renting of the properties results in
2  a loss at the end of every year?
3  A  Pretty much.
4  Q  Who keeps track of the records for the
5  properties, you, your wife, or somebody else?
6  A  I do most of the tracking.
7  Q  Are there times when the rental properties
8  need maintenance and repairs?
9  A  Yes, there are.
10 Q  Whose responsibility is that?
11 A  I would take care of most of them.
12 Q  Is your wife involved at all with the
13 maintenance or repairs of any of the rental
14 properties?
15 A  She writes out the bills sometimes. She
16 doesn't actually go and do the maintenance work.
17 Q  Is she ever involved in selecting people to
18 actually do the work?
19 A  No.
20 Q  Is that your responsibility?
21 A  Yes.
22 Q  Is she ever involved in overseeing any work

BRADFORD ASSOCIATES
HAL WALLS

Page 39

1  that's done or improving the work that's done?
2  A  No.
3  Q  Is that your responsibility?
4  A  Yes. She oversees me.
5  Q  Are you paid any monies by her to maintain
6  or repair the properties?
7  A  No.
8  Q  How often would you say you actually did the
9  maintenance or the repairs to the rental properties as
10 opposed to asking someone else to do the work?
11    MR. JOHNSON: You asking in percentage
12 terms?
13    MR. COX: Any way you're comfortable
14 answering the question.
15    THE WITNESS: About a 50-50.
16 BY MR. COX:
17 Q  So 50 percent of the time, you do the work
18 yourself, and 50 percent of the time, you'll find
19 someone else to do it?
20 A  Yes. I might go diagnose the problem, take
21 a look and see what it is, and I might find someone
22 else to do it.

BRADFORD ASSOCIATES
HAL WALLS

Page 40

1  Q  What affects whether you'll do it as opposed
2  to asking someone else to do it?
3  A  A lot of time it depends on whether I want
4  to do it.
5  Q  Any other factors?
6  A  Whether I want to do it sometimes is
7  determined by the severity or the skill level that may
8  be involved, time, and the physical work that might be
9  involved. I'm getting old. I don't like to do
10 certain things.
11 Q  On those occasions when you choose to have
12 other people do the work for you, how do you go about
13 finding those people?
14 A  I know people that can do certain things, so
15 I would call them and inquire would they be available
16 to do certain things for me, and if it's something
17 like painting, I might just go to a labor pool and
18 pick up some people.
19 Q  From approximately 2000 to 2005, identify
20 the people that you used to do maintenance or repair
21 work to any of your rental properties?
22 A  Well, I used Mr. Hinkle, I used a gentleman

BRADFORD ASSOCIATES
HAL WALLS

Page 41

1  by the name of Barry, B-A-R-R-Y.
2     MR. JOHNSON: Is that the first name?
3     THE WITNESS: First name. Some of the last
4  names I don't know. There's another guy named Barry,
5  also, two Barrys, a gentleman by the name of Ward, a
6  guy by the name of Edison, E-D-I-S-O-N, and a guy by
7  the name of Adam, A-D-A-M, a guy by the name of
8  Freddie, a guy by the name of Noe, N-O-E, a guy by the
9  name of Alex, A-L-E-X. That's all I can think of
10 right now. Some will come to me. I'd be glad to
11 share them.
12 Q  Is Vincent Edwards among them?
13 A  Oh, yeah. I forgot Ed, but he's on the bad
14 list, so I don't use him anymore.
15 Q  Why is he on the bad list?
16 A  He stole some of my equipment after the job.
17 After I had dismissed him, he came on the job and
18 stole some of my equipment.
19 Q  When did this happen?
20 A  This was subsequent to the August situation,
21 so it must have been maybe in September, I guess,
22 September 2005, maybe, somewhere in that area.

BRADFORD ASSOCIATES
HAL WALLS

Page 46

1  properties?
2    A  No.
3    Q  Did you ever withhold taxes for anyone that
4  ever did work for you on any of the rental properties?
5    A  No.
6    Q  Did you ever maintain insurance for anyone
7  who ever did work for you on any of the rental
8  properties?
9    A  No.
10   Q  Did you ever give anyone whoever did work
11 for you on any of the rental properties a 1099?
12   A  No.
13   Q  Why didn't you issue 1099s?
14   A  I just didn't do it.
15   Q  Do you have an understanding as to whether
16 1099s are issued to people who you consider to be
17 independent contractors?
18   A  I have that understanding, right.
19   Q  Did you have that understanding between 2000
20 and 2005?
21   A  Yes.
22   Q  I'm going to ask you a few questions

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Exceptional Service in Court Reporting and Litigation Support

BRADFORD ASSOCIATES
HAL WALLS

Page 47

1  specific to Mr. Edwards.  Did he operate under a
2  business name of any kind?
3    A  No.
4    Q  I believe you said, most of the time, you
5  paid him in cash, and sometimes you paid him by check?
6    A  Yes, that's correct.
7    Q  When you paid by checks, were the checks
8  made payable to him personally?
9    A  Maybe once or twice.  I recall a couple
10 times he used his girlfriend's name or some other
11 guy's name.
12   Q  Did you keep records of how much money you
13 paid for the people who did work for you at these
14 rental properties?
15   A  Yes, I have a record, but I don't know
16 exactly what I paid Vincent Edwards, and I don't have
17 it tabulated up for that particular year, but I have
18 the checkbook where I wrote down what I paid him or
19 either have receipts someplace where I paid him.
20   Q  With respect to the checkbook, that would
21 only evidence monies paid by check, correct?
22   A  Right.

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Exceptional Service in Court Reporting and Litigation Support

BRADFORD ASSOCIATES
HAL WALLS

Page 48

1    Q  With respect to the monies that I understand
2  you paid more frequently in cash, do you have a record
3  of those monies?
4    A  Some of it, I do.
5    Q  Do you have a record of any monies you ever
6  paid to Don Hinkle?
7    A  Other than a check, I didn't get a receipt
8  from him, because he'd done what's like -- after I got
9  to know him, the receipt I used was only to evidence
10 having the guy come back and say I didn't pay him, and
11 my relationship with Don was such that, if I gave him
12 $50, I gave him $50 for that job.  It wasn't like
13 tomorrow, he'd say I'm not -- you didn't pay me, where
14 as other people have to sign off on something that I
15 paid them.
16   Q  You've identified, including Mr. Hinkle and
17 Mr. Edwards, approximately ten people you used from
18 2000 to 2005 to do work on the rental properties.  If
19 I wanted to know how much money you paid any one of
20 them, would you be able to tell me?
21   A  It would take me a while to tabulate.
22   Q  How would you go about tabulating?

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Exceptional Service in Court Reporting and Litigation Support

BRADFORD ASSOCIATES
HAL WALLS

Page 49

1    A  Looking for my receipts and doing a
2  calculation.
3    Q  You're saying, somewhere there's a receipt
4  for every cash payment made to all these workers?
5    A  No, there's not.  I might have missed one or
6  two.
7    Q  Beyond one or two, are you saying there's
8  receipts for all of the other cash payments you made?
9    A  No.
10   Q  So any figure that you would provide me for
11 any of these individuals as to the amount of cash you
12 paid would be inaccurate?
13   A  Would not be completely accurate.  It would
14 be approximately.
15   Q  With respect to --
16   A  I paid other day workers, too, that I don't
17 know the name.  I maybe had them sign a piece of paper
18 at the end of the day so it can't come back and cause
19 something.
20   Q  Did you look for those in response to the
21 Subpoena that was served on you?
22   A  Yes.

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Exceptional Service in Court Reporting and Litigation Support

BRADFORD ASSOCIATES
HAL WALLS

Page 54

1   Q   Did you first meet him because he was a
2   neighbor of yours?
3   A   Yes, I met him in the neighborhood.
4   Q   At the time you met him, do you know whether
5   he was working for anyone?
6   A   I don't know what he was doing. I don't
7   know if he worked anywhere or not. He may have been.
8   Q   Do you know whether he was on disability?
9   A   I think he was doing -- I was under the
10  impression he was doing contract work, jobs here and
11  there. I don't know if he had a particular company at
12  the time while he was working.
13  Q   Did you get that impression from him?
14  A   From observing him.
15  Q   What does that mean "observing him"? Where?
16  A   He might have told me he did this work or
17  that work.
18  Q   Did he do work out of his house, or did he
19  have a separate facility he maintained?
20  A   He didn't have a separate facility.
21  Q   It's your understanding that he worked out
22  of his own house?

BRADFORD ASSOCIATES
HAL WALLS

Page 55

1   A   Yes.
2   Q   Did he have any assistants that worked with
3   him?
4   A   I don't know. I heard him talk about people
5   long time ago, that he had some guy, but I don't know
6   his name.
7   Q   Did he have any guys that helped him when he
8   was doing work for you?
9   A   No.
10  Q   How did you pay Mr. Hinkle?
11  A   I'm sorry. I don't understand the question.
12  Q   How did you pay him? Did you pay him by
13  day, by hour, or by week?
14  A   I paid him usually every other day, or
15  something like that, or, sometimes, I'd pay him at the
16  end of the week. It just depended.
17  Q   What did it depend on?
18  A   Whether I had the money and whether he
19  needed the money and whether the job was finished or
20  not.
21  Q   Did you always pay him at the end of a given
22  job, or sometimes you paid him after a couple jobs?

BRADFORD ASSOCIATES
HAL WALLS

Page 56

1   A   Sometimes I pay him after a couple jobs.
2   Q   Did you have an ongoing relationship with
3   Mr. Hinkle?
4   A   I would say so, yes.
5   Q   Did you pay him a certain amount per hour?
6   A   Basically, I would pay him like $120 a day
7   for whatever the job was.
8   Q   Was that based on his working a certain
9   number of hours per day?
10  A   Pretty much, yeah.
11  Q   How many hours per day?
12  A   About an eight-hour day.
13  Q   Who decided how many hours per day he would
14  work when he was working for you?
15  A   He did.
16  Q   He did?
17  A   Yeah. He usually worked about six -- about
18  eight to seven hours a day. Occasionally, he worked
19  even longer.
20  Q   On the days when he worked in excess of
21  eight hours a day, were you still paying him $120 a
22  day, or more or less?

BRADFORD ASSOCIATES
HAL WALLS

Page 57

1   A   Same thing.
2   Q   I'm trying to figure out if it was $120 a
3   day irrespective of the hours he worked?
4   A   It was $120 a day.
5   Q   No matter what he worked?
6   A   Usually, he didn't go over, just a little,
7   maybe 30 minutes, or something like that.
8   Q   Did you ever provide Mr. Hinkle any
9   benefits?
10  A   No.
11  Q   When was the last time Mr. Hinkle did any
12  work for you?
13  A   Last year, he helped me do some work in my
14  bathroom at home.
15  Q   Plumbing work?
16  A   Yes, he helped me do plumbing work in my
17  bathroom at home.
18  Q   Do you remember approximately when that was
19  in 2006?
20  A   It was the 1st of December, not too long
21  before Christmas. I was trying to get my bathroom
22  together, so he helped me get the shower thing

BRADFORD ASSOCIATES
HAL WALLS

Page 58

1  straight.
2   Q   Was that a one-day project?
3   A   No. It took me about two weeks. He came
4  through and worked -- did some work for me about two,
5  three days, couple hours each day. He wasn't feeling
6  that well, so I actually had Mr. Edison and Mr. Ward
7  do most of the work, and, Don, living next-door just
8  walked through, and I did quite a bit of work myself,
9  too.
10  Q   What was the purpose of Mr. Hinkle walking
11 through when Ward and Edison were doing the work?
12  A   You've got to ask them that question.
13  Q   Maybe I misunderstood. I thought you were
14 asking him to walk there?
15  A   No.
16  Q   Were you paying him $120 a day for the two,
17 three days that he worked?
18  A   Yes.
19  Q   I believe you said, on those two, three
20 days, he worked a couple of hours each day?
21  A   Couple days, he might have worked a little
22 longer. I think, one day, we put that faucet down.

BRADFORD ASSOCIATES
HAL WALLS

Page 59

1  That may have been about a half a day, because the
2  faucet was a little complicated. The shower head on
3  the shower was the most complicated shower head.
4   Q   Do you know whether or not Mr. Hinkle was
5  doing work for anyone else other than you from -- I
6  guess you said that you started doing work with him
7  in, what, 2000, so from 2000 to 2005, do you know
8  whether he was doing work for anybody else at that
9  time?
10  A   Yes.
11  Q   He was?
12  A   Yes.
13  Q   Who else was he doing work for?
14  A   I don't know, but he did other jobs, also.
15 It's probably best to direct that towards him.
16  Q   I don't want to put words in your mouth.
17 Was it approximately 2000 when you started using
18 Mr. Hinkle for jobs?
19  A   I don't know the exact timeframe. I don't
20 remember.
21  Q   Was it approximately 2000?
22  A   Could have been 2000; could have been '99.

BRADFORD ASSOCIATES
HAL WALLS

Page 60

1  I don't recall.
2   Q   From 2000 to 2005, so August of 2005, how
3  frequently did Mr. Hinkle work for you?
4   A   Repeat the question.
5   Q   From 2000 to 2005, approximately August of
6  2005, how frequently did Mr. Hinkle work for you?
7   A   He worked -- it's really hard to say,
8  because sometimes he worked a while, and, then, he
9  would take off, and I didn't see him for a while, so
10 it was on and off.
11  Q   Can you give me a sense of whether he worked
12 a certain number of days for you per week?
13  A   Some days he worked a whole week. Some
14 weeks he worked a day. Some weeks, he wouldn't work.
15 Some weeks, he might work three days.
16  Q   Do you have a record anywhere --
17  A   -- of the exact number of days?
18  Q   The exact number of days or which days?
19  A   No, I don't.
20  Q   How often would you say he worked an entire
21 week?
22  A   Like I said, some weeks, he would work a

BRADFORD ASSOCIATES
HAL WALLS

Page 61

1  whole week, and some weeks, he might not.
2   Q   I'm just trying to get a sense of how often
3  he worked an entire week.
4   A   It's difficult for me to say. There were
5  time periods that he might work a whole week for a
6  whole month, and, then, there were time periods he
7  might not work for a month, so I'm saying over the
8  six-, seven-year period. I can't say exactly -- I
9  can't answer your question correctly.
10  Q   I'm just trying to understand what you just
11 said. Were there times he would work four consecutive
12 weeks?
13  A   Yes.
14  Q   Does that mean he would work four
15 consecutive full weeks, so five, six, seven days per
16 week?
17  A   Right.
18  Q   Can you tell me how often he worked for a
19 month at a time for you?
20  A   No, I couldn't, not over a six-year period.
21 I have to go back and put some records together to see
22 what that would be.

BRADFORD ASSOCIATES
HAL WALLS

Page 62

1  Q  When you say "records," what records are you
2  talking about that you would be using to piece this
3  together?
4  A  If I could find any receipts, checks,
5  anything, stuff that I bought, the jobs we did, or
6  what have you.
7  Q  Did you ever keep any calendars?
8  A  No, not a work calendar like that. At one
9  time, I did, when I first started. I kept a calendar
10 back in maybe 2000, 2001, something like that.
11 Q  I know some of these questions you may tell
12 me you don't have the answers to, but I need to ask
13 because I'm trying to get a sense. So, on occasion,
14 he would work four weeks at a time, which would be an
15 entire month, correct?
16 A  That's correct.
17 Q  So from 2000 to 2005, do you have a sense of
18 whether he worked for you for an entire month more
19 than, say, six times?
20 A  So more than six full months during the
21 five-year period. Yes, probably during the six-year
22 period.

BRADFORD ASSOCIATES
HAL WALLS

Page 63

1  Q  So probably more than six months?
2  A  Yes.
3  Q  When he was working for you for an entire
4  week, when was he paid?
5  A  The same as I said before. Sometimes I
6  would pay him at the end of the job, and sometimes I
7  would pay him after one day or a couple days. It
8  would depend, but most of the time, I would pay him at
9  the end of the week.
10 Q  Most of the time, when you paid him at the
11 end of the week, would that be even if the job had
12 been completed at that time?
13 A  Yes.
14 Q  Payment would be $120 per day irrespective
15 of the numbers of hours he actually worked?
16 A  No. He would probably write it off to a
17 half a day. If he worked that morning and that
18 afternoon, I would just pay him for that morning. He
19 was a fair man. He wouldn't try to gouge you. Do you
20 understand what I'm saying?
21 Q  Uh-huh. Did you ever pay Mr. Hinkle by the
22 project?

BRADFORD ASSOCIATES
HAL WALLS

Page 64

1  A  No.
2  Q  Did you ever pay Mr. Edwards by the project?
3  A  I don't think so.
4  Q  Do you know whether Mr. Edwards or
5  Mr. Hinkle advertised for their services?
6  A  I don't know, but I don't think Vince ever
7  did.
8  Q  With respected to Mr. Hinkle, you're not
9  sure?
10 A  I'm not sure what he did prior to working
11 with me, no.
12 Q  I believe you said, at times, Mr. Hinkle did
13 painting work for you?
14 A  Uh-huh.
15 Q  At time plumbing work?
16 A  Yes. I didn't say he did painting, but he
17 did --
18 Q  Other than painting and plumbing, carpentry?
19 A  Yes.
20 Q  With respect to anything else other than
21 painting, plumbing, or carpentry?
22 A  What's the question?

BRADFORD ASSOCIATES
HAL WALLS

Page 65

1  Q  Anything else, any other kind of work?
2  A  Yes. Anything dealing with home
3  improvement, we've done together pretty much on some
4  occasion or another.
5  Q  Did you ever provide Mr. Hinkle with any
6  training with respect to any of the work that he did
7  for you?
8  A  Probably just the opposite. He provided me
9  with the training.
10 Q  Did you ever provide Mr. Edwards with any
11 training with respect to any of the work he did for
12 you?
13 A  No.
14 Q  Was anyone involved in the maintenance or
15 repairs for your rental properties other than you,
16 meaning the oversight, making sure they got done,
17 keeping tack of what was done, what needed to be done?
18 A  No.
19 Q  Just you?
20 A  No.
21 Q  Who provided the tools on the job that you
22 had others do for you?

## BRADFORD ASSOCIATES
## HAL WALLS

Page 70

1  BY MR. COX:
2  Q  I think, when we broke, you had said that,
3  with respect to the purchase of supplies, on all the
4  jobs in which Mr. Hinkle and Mr. Edwards did the work,
5  you bought the supplies; is that correct?
6  A  Yes. I paid for them. Occasionally, I
7  would give them money to purchase them, but, most of
8  the time, I would front the money, or I would
9  reimburse Mr. Hinkle more so than Vince. Vince, I
10 might send to the store to get a nut or bolt, but I
11 wouldn't trust him with that much money, but
12 Mr. Hinkle, he might pick up something, and I'll
13 reimburse him.
14 Q  Most of the time, you selected the supplies
15 and purchased them yourself?
16 A  Yes.
17 Q  Was there any work that Mr. Hinkle or
18 Mr. Edwards did for you that you could not have done
19 yourself?
20 A  The work Mr. Hinkle had done I could have
21 done myself.
22 Q  What work?

## BRADFORD ASSOCIATES
## HAL WALLS

Page 71

1  A  Some of the electrical work, some plumbing.
2  Like I said, Mr. Hinkle is a very skilled person, and
3  a lot of things I do now, I picked up from him.
4  Q  Other than electrical or plumbing work that
5  he did, was there any other work he did for you that
6  you could not do for yourself?
7  A  Carpentry work, skilled carpentry work,
8  things of that nature, he's very skilled at those
9  things.
10 Q  Among the people that you had identified
11 previously, was he the first person you would normally
12 call to see if he could do work for you?
13 A  I'm sorry. I don't understand the question.
14 I just want to make sure I understand.
15 Q  You identified about ten people who had done
16 work for you on these rental properties from 2000 to
17 2005. I was just wondering, if a job comes up and you
18 need work done, is Mr. Hinkle the first person you
19 pick up the phone to call?
20 A  No, not necessarily.
21 Q  Do you have a method as to who you would go
22 to first typically?

## BRADFORD ASSOCIATES
## HAL WALLS

Page 72

1  A  It depends. I could go to people that can
2  do it and the cheapest and more convenient for them.
3  Q  Did you consider yourself with respect to
4  the work that either Mr. Edwards or Mr. Hinkle did to
5  have the ability to dictate how they did their work?
6  A  Not in the sense of just dictating. I had
7  some knowledge of the work, and, mainly, I'd tell them
8  what I wanted done, but as to the methodology in which
9  they proceeded, it was pretty much up to them.
10 Q  When you say "pretty much," did you ever
11 have an occasion to instruct Mr. Edwards or Mr. Hinkle
12 how to do a particular job?
13 A  There are different levels of instruction.
14 If I wanted the wall painted, I might tell them to
15 start in this corner and do that corner and that
16 corner, but I wouldn't tell them how to do the brush
17 strokes or nothing like that. Mr. Hinkle, I wouldn't
18 tell him how to put it in because he knew more about
19 that than I did.
20 Q  Let me start with what I think is the easier
21 of the two. It's my understanding that Mr. Edwards
22 did exclusively painting work for you?

## BRADFORD ASSOCIATES
## HAL WALLS

Page 73

1  A  No. I said earlier he did other things,
2  like maintenance trash, clean houses.
3  Q  Did he do principally painting work for you?
4  A  Pretty much, yeah.
5  Q  With respect to the painting work that he
6  did, what instruction did you give him?
7  A  Well, I'll tell him what color and where
8  primarily.
9  Q  Did he do mostly interior or exterior
10 painting?
11 A  Mostly interior.
12 Q  Did you tell him in which room he should
13 start?
14 A  On occasion, I would, yeah.
15 Q  You indicated a minute ago that you, on some
16 occasions, anyway, you may have said to somebody start
17 in this corner as opposed to another corner. Is that
18 something you did with respect to Mr. Edwards?
19 A  No. I mean, occasionally, I might have. I
20 don't know. I just said paint the room.
21 Q  So with respect to Mr. Edwards, you never
22 got into that kind of detail, start in this corner as

## BRADFORD ASSOCIATES
## HAL WALLS

Page 74

1  opposed to another corner?
2     A   I don't think so. Usually, you can tell
3  what kind of painter a guy is by the way he does,
4  where he starts to cut it out, how he works.
5     Q   How much painting did Mr. Hinkle do for you?
6     A   Not that much.
7     Q   On occasions when he did do painting for
8  you, what kind of instructions did you give him?
9     A   I'd just tell him we're going to paint this
10 room or building.
11    Q   Nothing more than that?
12    A   That's all.
13    Q   Who determined exactly when, and, again,
14 this is with respect to Mr. Hinkle or Mr. Edwards --
15 particular work would be done?
16    A   I did.
17    Q   Who determined where it would be done?
18    A   I did.
19    Q   How often, if ever, were you actually
20 on-site or at a particular property while Mr. Hinkle
21 or Mr. Edwards were working?
22    A   It just depends. Some days I might have

## BRADFORD ASSOCIATES
## HAL WALLS

Page 75

1  been there all day working alongside him, and other
2  days I might not be there at all.
3     Q   What determines whether you would be there
4  all day or not?
5     A   Whether I had something else to do or a
6  place to go, whether I went to get supplies. It just
7  depended on what I was doing that day. I'm not sure.
8     Q   Did you try to be on-site or at a particular
9  property as often as possible when Mr. Hinkle or
10 Mr. Edwards was doing work for you?
11    A   Most of the time, I tried to be on the job,
12 but that was not always the case.
13    Q   What was the purpose of you trying to be on
14 the job most of the time?
15    A   I was just trying to cut costs and do some
16 work myself.
17    Q   Was any part of the reason to monitor what
18 these individuals were doing for you?
19    A   Sometimes when you're there, you don't see
20 what's happening. Particularly with new people, you
21 want to see what's going on. I wasn't really
22 satisfied with Vince's work, but my history with

## BRADFORD ASSOCIATES
## HAL WALLS

Page 76

1  Mr. Hinkle was he didn't require any monitoring.
2     Q   Do you have a sense of how often you were
3  actually on jobs with him? Would you say it's more
4  frequently or less frequently than 50 percent of the
5  time?
6     A   I would say I would be on the job most of
7  the time, at least come by the job most of the time.
8     Q   Do you have any understanding with
9  Mr. Hinkle at any time, from 2000 to 2005, as to his
10 availability or when he could make himself available
11 to work for you?
12    A   No. He was available most of the time.
13 Sometimes he would let me know in advance he had
14 something else to do, or he was taking off to maybe do
15 another job or just taking off, period.
16    Q   Was there any understanding as to whether he
17 could be available, Monday through Friday, nine to
18 five, just on weekends, or anything like that?
19    A   We had nothing written. He knew most of the
20 time I worked -- we worked Monday through Friday, and
21 sometime on Saturday, but I can't say, hey, I want you
22 here this day, that day. Those are the working hours,

## BRADFORD ASSOCIATES
## HAL WALLS

Page 77

1  and those are the days that construction people work.
2     Q   I sort of missed that. You did tell him or
3  did not?
4     A   Did not, no.
5     Q   How much advanced notice would you give
6  either Mr. Edwards or Mr. Hinkle of your need for them
7  on a particular job?
8     A   Usually, they would know the day before that
9  I'm going to work.
10    Q   Did you ever tell either of them that you
11 wanted them to work a certain number of hours or from
12 nine to 12:00 on any given day or one to four,
13 whatever it might be?
14    A   No.
15    Q   That, you left up to both of them?
16    A   Yeah. I might, if it was a Saturday, say
17 I'm only going to work a half-day today because it's
18 Saturday.
19    Q   That's what you would say to them?
20    A   I would envision saying that. I don't know
21 how many times I said that. Saturday, I'm going to
22 work, but only do a half a day, but during the week,

1  people either Mr. Hinkle or Mr. Edwards could work for
2  while they were working for you?
3    A  No.
4    Q  Had they been working for a number of other
5  people, would you still have used them?
6    A  Yes, as long as I could get what I wanted
7  done or couldn't find anyone else.
8    Q  So if they were available, you would use
9  them?
10   A  Yes.
11   Q  I believe that you said you fired
12 Mr. Edwards; is that correct?
13   A  That's correct.
14   Q  Did you give him any notice before you fired
15 him?
16   A  No.  I just told him don't come back.
17   Q  Did you give him any reason why you fired
18 him?
19   A  I told him I had nothing else for him to do.
20   Q  Did you feel you needed a reason to fire
21 him, or you could just fire him if you felt like it?
22   A  I could fire him if I felt like it.  I had

1  nothing else for him to do.  That's what I told him.
2    Q  With respect to Mr. Hinkle, did with feel
3  you could fire him at any time or that you needed to
4  have a reason to fire him?
5    A  Like I said, getting back to Vince, I told
6  him I had nothing else for him to do, so I didn't want
7  him back that day.  He can characterize it however he
8  wants.
9    Q  My question isn't aimed at his
10 characterization.  What I'm trying to find out is
11 whether you felt like you could fire him just because
12 you felt like it or because you needed to have a
13 reason to fire him?
14   A  I fired him just because I felt like it.
15   Q  Could you fire Mr. Hinkle just because you
16 felt like it?
17   A  Yes.
18   Q  With respect to the incident that gave rise
19 to Mr. Hinkle's alleged injuries, do you recall that
20 day, August 29, 2005?
21   A  I do.
22   Q  What was going to be done at -- I believe it

1  was 1117 Abby Place, Washington, D.C.; is that
2  correct?
3        MR. JOHNSON:  Is it Northeast.
4        THE WITNESS:  Northeast.
5  BY MR. COX:
6    Q  What needed to be done at that job?  What
7  was supposed to happen that day?
8    A  On that day, if I recall correctly, I was
9  going to have Vince to install a skylight.  I had
10 purchased a skylight and brought it to the job for
11 Vince to install it, and this skylight doesn't take
12 that long, usually about an hour or two, two hours at
13 the most.
14       So Don wasn't working that day, so when I
15 came outside, I asked him to ride with me because I
16 was going to look at Vince and make sure he did this
17 thing right, and we rode up for Vince to do the
18 skylight.
19   Q  Why was Vince doing the skylight and not
20 Mr. Hinkle?
21   A  Don was not working with me that day and
22 hadn't worked for me the day before either.

1    Q  Why was that?  Do you know?
2    A  I don't recall exactly why.
3    Q  If he wasn't working for you that day, what
4  made you think he would be available to come with you
5  to the property?
6    A  I saw him outside when I was leaving.  I
7  told him he could ride with me, what I was doing.
8    Q  Did you explain to him, then, what the
9  purpose of the trip was?
10   A  Uh-huh.
11   Q  What did you say?
12   A  I said I got the skylight.  Vince is going
13 to put the skylight on.  You can ride with me and take
14 a look at it.
15       The thing about a skylight is you've got to
16 seal it properly; otherwise, it will leak.
17   Q  Is the installation of the skylight
18 something you could have done yourself?
19   A  I had never done one before.
20   Q  Had Mr. Hinkle?
21   A  Yes.  Vince, I don't know.  If I asked him,
22 he might have said yes and still not have done it

BRADFORD ASSOCIATES
HAL WALLS

Page 90

1  before. I don't know.
2    Q   Had you already purchased the replacement
3  skylight?
4    A   Yes.
5    Q   You were going to remove the other skylight
6  and put the new one in?
7    A   Yes.
8    Q   Ultimately, was it something that was done
9  that day?
10   A   Yeah. Vince put the skylight in, and it's
11 leaking today.
12   Q   So he actually put the skylight in that day,
13 August 29th?
14   A   Either that day or the next day. I don't
15 recall. When the incident happened, it got kind of
16 chaotic.
17   Q   Tell me a little bit about this property in
18 Northeast. How many stories is it?
19   A   It's a two-story house with a basement.
20   Q   I'm assuming the skylight is on the roof?
21   A   Yes, the top level.
22   Q   And how was the top level going to be

BRADFORD ASSOCIATES
HAL WALLS

Page 91

1  accessed, or how was it accessed?
2    A   We accessed it from the rear, and there's a
3  rear porch on the first level, so you go to the rear
4  porch -- we went to the rear porch, went up on the
5  first level, and, then, take a ladder on that level
6  and go to next level.
7    Q   How did you get up onto the rear porch?
8    A   I said we took a ladder to go to the top of
9  the rear porch, which would be the top of the first
10 level, and, then, we took that same ladder, and you go
11 to the next level.
12   Q   So a ladder was put against the house from
13 the ground level; is that correct?
14   A   Yes.
15   Q   And did all three of you, then, climb up to
16 the roof on the first level?
17   A   No.
18   Q   Tell me what happened.
19   A   A ladder was put on the ground to the top of
20 the porch on the first level. Don and Vince went up,
21 and, then, they pulled that ladder up and put it in
22 place to go to the next level. I did not go up.

BRADFORD ASSOCIATES
HAL WALLS

Page 92

1    Q   Did you stay on the ground at all times?
2    A   Yes.
3    Q   Were you holding the ladder at any time?
4    A   I may have. I don't recall.
5    Q   Was the skylight with you when you went to
6  the property?
7    A   Yes.
8    Q   Was it your intention that the skylight be
9  installed at the time that you arrived, during that
10 one visit?
11   A   No. My intention was to take a look at it,
12 get Vince started, and Don and I were going to leave.
13   Q   What did you intend Don's role to be while
14 at the property, Mr. Hinkle?
15   A   He was going to observe. Like I indicated
16 before, he's real skilled and knowledgeable. I just
17 wanted his advice to make sure the way we were going
18 to install -- Vince was going to install it was going
19 to be the proper way to install it.
20   Q   Was it your plan to have him stay and watch
21 Mr. Edwards install it?
22   A   No. He was going to tell him how to install

BRADFORD ASSOCIATES
HAL WALLS

Page 93

1  it, and, then, we were leaving.
2    Q   Whose ladder was it?
3    A   My ladder.
4    Q   Is it a ladder that's kept at the property,
5  or was it brought with you to the property?
6    A   I think it was left at the property from
7  another job.
8    Q   Who supplied the tools to install the
9  skylight?
10   A   I think I did. There's not that much
11 required for a skylight.
12   Q   Whatever was required, you provided?
13   A   Right.
14   Q   Do you remember who climbed the ladder first
15 to get from the ground level to the first floor roof?
16   A   No, I don't.
17   Q   Did you see Mr. Edwards and Mr. Hinkle
18 putting up to ladder from the first floor roof to the
19 second floor roof?
20   A   I saw him, yes, but I don't recall exact
21 details.
22   Q   What do you recall?

BRADFORD ASSOCIATES
HAL WALLS

Page 94

1   A   I just knew how the ladder went. It's not
2   like I was watching who placed what and where. It was
3   just a routine operation. You take a ladder and pull
4   it up and take it to the next level.
5   Q   Did you see Mr. Hinkle fall?
6   A   Yes, I saw him as he was falling. I heard
7   the commotion and looked up, and he was still falling.
8   Q   So you heard something before you saw
9   something?
10  A   I didn't see exactly what happened. When I
11  saw him, he was falling off the ladder.
12  Q   Did you ever have any intention of going up
13  to the second story to look at the skylight yourself?
14  A   It wasn't my intention to go up. It wasn't
15  necessary. We just wanted to do a quick look and make
16  sure that what Vince had in mind to do, that was the
17  proper way to do it.
18  Q   Had you provided Mr. Hinkle or Mr. Edwards
19  any instruction as to how to install the skylight?
20  Did you provide any instruction as to how to use the
21  ladder to access the roof?
22  A   No.

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Exceptional Service in Court Reporting and Litigation Support

BRADFORD ASSOCIATES
HAL WALLS

Page 95

1   Q   Did you actually see Mr. Hinkle climb the
2   ladder from the first floor to the second floor?
3   A   I don't know if I was looking exactly at
4   him, what I was doing at the time, but I think Vince
5   went up first, and I think Don took off after that.
6   Q   Was there any discussion about the use of
7   the ladder before it was actually used?
8   A   No. If it were, it might have been between
9   Don and Vince.
10  Q   So you heard some commotion, looked up, and
11  saw Mr. Hinkle falling; is that correct?
12  A   That's right.
13  Q   Did you see, then, where Mr. Edwards was?
14  A   He was on the top level.
15  Q   Did you notice if he was doing anything?
16  A   He was holding the ladder.
17  Q   Did the ladder fall along with Mr. Hinkle?
18  A   I don't know if the ladder fell completely
19  or not, but the ladder moved.
20  Q   Did you see it move?
21  A   Uh-huh.
22  Q   What part of the ladder did you see move?

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Exceptional Service in Court Reporting and Litigation Support

BRADFORD ASSOCIATES
HAL WALLS

Page 96

1   A   The top part.
2   Q   How did it move?
3   A   It slid to the side as Mr. Hinkle was
4   falling.
5   Q   When you say "to the side," did it slide to
6   the left or the right if you were looking at it from
7   ground level?
8   A   It slid to the right.
9   Q   At any point in time, did the ladder leave
10  Mr. Edwards' hands?
11  A   I'm trying to recall. I don't think it left
12  his hands. I think his hands moved along with the
13  ladder, and at some point, I think Don released and
14  fell.
15  Q   Do you know why Mr. Hinkle fell?
16  A   No.
17  Q   Were there any discussions afterwards among
18  the three of you or anyone else as to why Mr. Hinkle
19  fell?
20  A   We had some discussions, but we didn't come
21  up with a solution. I was telling Vince that -- he
22  was holding the ladder, and he said he was holding the

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Exceptional Service in Court Reporting and Litigation Support

BRADFORD ASSOCIATES
HAL WALLS

Page 97

1   ladder, and I just don't know why.
2   Q   What happened, if anything, after Mr. Hinkle
3   fell?
4   A   First, when he fell, we approached him to
5   see how he was doing, and he was a little dizzy, and
6   we wanted to call 911. He told us not to call 911,
7   but, then, the neighbor next-door called 911 anyway;
8   and we came out -- they came out and talked to Don,
9   and he didn't want to go to emergency; so at that
10  point, he got in my truck, and we were leaving. I
11  told him I would take him to the clinic, so I
12  proceeded to take him to a hospital in Virginia.
13  Q   Was Mr. Edwards to be paid for the work that
14  he did that day for the installation of the skylight?
15  A   Yes.
16  Q   Did you intend to pay him, or what did you
17  pay him?
18  A   I don't recall exactly. I probably paid him
19  for the full day, I'd imagine.
20  Q   Were you intending to pay Mr. Hinkle?
21  A   No.
22  Q   Did you ever discuss with Mr. Hinkle whether

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Exceptional Service in Court Reporting and Litigation Support

BRADFORD ASSOCIATES
HAL WALLS

Page 98

1  he would be paid for coming with you to the property
2  that day?
3      A   No.
4      Q   There was no discussion?
5      A   No.
6      Q   Do you know whether or not he had an
7  understanding for being paid when he came with you?
8      A   He rode with me on different occasions. He
9  was not paid just to ride along. He wasn't doing
10 anything, and he didn't mind.
11     Q   Is the answer, no, you don't know whether or
12 not he had an understanding that he would be paid?
13     A   It was never verbalized to me.
14     Q   Is it fair to say you never told him he
15 would not be paid?
16     A   I didn't pay him for that day.
17     Q   Did you ever tell him you would not be
18 paying him for that day?
19     A   I don't think I told him in those words, no.
20 I don't know of an occasion why I would have told him
21 that.
22     Q   Did he ever ask you to be paid for that day?

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Exceptional Service in Court Reporting and Litigation Support

---

BRADFORD ASSOCIATES
HAL WALLS

Page 99

1      A   No.
2      Q   Was Mr. Hinkle to have a role at all in the
3  actual installation of the skylight?
4      A   No more than I already stated, Counsel. He
5  was just basically going to see what Vince was going
6  to do and make sure that was the proper way to install
7  it.
8      Q   I believe you said before you're not aware
9  of anyone filing anything with the worker's
10 compensation commission in either D.C., Virginia, or
11 anywhere else relating to this incident; is that
12 correct?
13     A   Not to my knowledge.
14     Q   Did you have any discussions with anyone
15 about filing anything with the Worker's Compensation
16 Commission in any jurisdiction?
17     A   No.
18     Q   Did you believe, on August 29, 2005, that
19 Mr. Hinkle had been injured in some way?
20     A   I did. Like I said, I took him to the
21 hospital.
22     Q   Did you ever yourself notify Erie Insurance

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Exceptional Service in Court Reporting and Litigation Support

---

BRADFORD ASSOCIATES
HAL WALLS

Page 100

1  Company of this incident?
2      A   No, I didn't.
3      Q   Why not?
4      A   I didn't notify them because, first of all,
5  I thought that I wanted to see the severity of it,
6  whether I had to get that far or not, and if Don gave
7  me a bill, I would send it to the insurance company
8  and let them pay it; and, also, he said he had health
9  insurance that would pay his bill, so I said, if you
10 had insurance that's going to pay it, there's no need
11 to increase my rate. One insurance is as good as
12 another one.
13     Q   Any other reason why you didn't tell Erie?
14     A   No.
15     Q   Prior to the date of this incident, did you
16 have a copy of your landlord's policy with Erie, the
17 one that's the subject matter of this dispute?
18     A   Yeah, I got one. I probably got one,
19 probably, initially when I got the property.
20     Q   Had you read it before this incident?
21     A   No.
22     Q   Did you know you had notification

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Exceptional Service in Court Reporting and Litigation Support

---

BRADFORD ASSOCIATES
HAL WALLS

Page 101

1  responsibilities in the policy?
2      A   Yeah. I know you had to tell them.
3      Q   Did you know you had to tell them as soon as
4  possible?
5      A   Within a reasonable timeframe.
6      Q   Did you know that Mr. Hinkle was going to
7  contact Erie about the incident?
8      A   I didn't know what Mr. Hinkle was going to
9  do.
10     Q   Do you know how Mr. Hinkle knew Erie insured
11 you or had a landlord's policy?
12     A   I gave him the information.
13     Q   When did you give him the information?
14     A   Not too long after the accident.
15     Q   Did he ask for the information?
16     A   No. I volunteered it. I told him I had
17 Erie, and, occasionally, he had some -- he had
18 insurance, but there were some portions that weren't
19 covered from his deductible, so that's when I told him
20 I had Erie coverage.
21     Q   How long after August 29, 2005, did you
22 provide that information to him?

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Exceptional Service in Court Reporting and Litigation Support

BRADFORD ASSOCIATES
HAL WALLS

Page 114

1  going to ask you a few questions, first, about your
2  employment relationship with Mr. Hinkle.
3      I understand from your prior testimony, you
4  believe Mr. Hinkle was an independent contractor; is
5  that correct?
6      A   That's correct.
7      Q   And I understand, from your prior testimony,
8  that every indication that you've ever had is
9  Mr. Hinkle believed he was an independent
10 contractor --
11     A   Yes.
12     Q   You've got to let me finish the question
13 before you answer; otherwise, we'll have a situation
14 that's hard for the reporter.
15         Mr. Hinkle, I understand from what you said
16 previously, you also believe that Mr. Hinkle thought,
17 when he did work with you, he was an independent
18 contractor; is that correct?
19         MR. COX: Objection. You can answer.
20         THE WITNESS: What's the question?
21         MR. JOHNSON: Read it back.
22         (The previous question was read back.)

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Exceptional Service in Court Reporting and Litigation Support

BRADFORD ASSOCIATES
HAL WALLS

Page 115

1          THE WITNESS: That's correct.
2  BY MR. JOHNSON:
3      Q   You never paid social security taxes for
4  Mr. Hinkle, did you?
5      A   No.
6      Q   Mr. Hinkle never accumulated any retirement
7  benefits while working with you, did he?
8      A   No.
9      Q   Mr. Hinkle never had any annual leave while
10 working with you, did he?
11     A   No.
12         MR. COX: Objection.
13 BY MR. JOHNSON:
14     Q   Mr. Hinkle, in several areas of work that
15 you needed from him, had significantly more expertise
16 than you, didn't he?
17         MR. COX: Objection.
18         THE WITNESS: He did.
19 BY MR. JOHNSON:
20     Q   That would include in the electrical field,
21 for example, correct?
22     A   Yes.

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Exceptional Service in Court Reporting and Litigation Support

BRADFORD ASSOCIATES
HAL WALLS

Page 116

1          MR. COX: Objection. Go off the record.
2          (Discussion off the record.)
3          MR. JOHNSON: Back on the record.
4          MR. COX: Mr. Johnson and I just had a quick
5  discussion off the record, and for the record, I would
6  like to say I have an ongoing objection or a standing
7  objection to leading questions by Mr. Johnson. I
8  don't think they're appropriate in this particular
9  context; and with no opposition from him, I'll just
10 continue to have a standing objection so I don't have
11 to object to every question.
12         MR. JOHNSON: That's fine. I, of course,
13 take the position, in this deposition, I'm
14 cross-examining. It was a deposition noted by
15 Mr. Cox. He's conducted it for the past two hours,
16 and I'm now, in my view, entitled to cross-examine the
17 Witness. That's why I'm asking leading questions, but
18 I understand his objection, and I have no problem with
19 the idea that he has a continuing objection.
20         Do we have a pending question before the
21 last objection?
22         ("QUESTION: That would include in the

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Exceptional Service in Court Reporting and Litigation Support

BRADFORD ASSOCIATES
HAL WALLS

Page 117

1  electrical field, for example, correct?")
2          THE WITNESS: Yes.
3  BY MR. JOHNSON:
4      Q   Mr. Hinkle also had more expertise than you
5  in the plumbing field, correct?
6      A   Yes. In most fields in construction. He
7  had been in that for years.
8      Q   When Mr. Hinkle was working in one of these
9  fields where he had more expertise than you, I take it
10 you didn't actively supervise his work; is that
11 correct?
12     A   That's correct.
13     Q   If Mr. Hinkle was able to finish a job in
14 six or six-and-a-half-hours, you would typically pay
15 him the full $120 rate for that job on that date; is
16 that correct?
17     A   Yes.
18         MR. COX: Objection.
19 BY MR. JOHNSON:
20     Q   If Mr. Hinkle was able to finish a job for
21 you in two or two-and-a-half hours, hypothetically,
22 you would typically pay him the half-day wage for that

TOLL FREE: 877-718-1850 - LOCAL: 301-762-1606 / 202-833-3399 / 703-525-8251
Exceptional Service in Court Reporting and Litigation Support

BRADFORD ASSOCIATES
HAL WALLS

Page 118

1  job; is that correct?
2      A   Yes.
3          MR. COX: Objection.
4  BY MR. JOHNSON:
5      Q   You did not carry any worker's compensation
6  insurance for any individual; is that correct?
7      A   I did not.
8      Q   When you would pay Mr. Hinkle, it was often
9  in cash; is that correct?
10     A   That's correct.
11     Q   When you paid him in cash, you did not
12 deduct anything from any of the payment you gave him;
13 is that correct?
14     A   That's correct.
15     Q   From time to time, you paid him with a
16 personal check; is that correct?
17     A   Yes.
18     Q   When you paid him by a personal check, you
19 did not deduct anything from that check; is that
20 correct?
21     A   That's correct.
22     Q   On the day of this accident, I believe you

BRADFORD ASSOCIATES
HAL WALLS

Page 119

1  testified you felt Mr. Hinkle was just coming along as
2  he had done on several occasions in the past to take a
3  look at this and help you out; is that correct?
4          MR. COX: Objection.
5          THE WITNESS: That's correct, not to make
6  sure how the job was going to be done, if it was the
7  proper way to do it.
8  BY MR. JOHNSON:
9      Q   You did not view the activity that he was
10 engaged in that day as even independent contractor
11 activity on his behalf; is that correct?
12     A   He was going to walk up the ladder and take
13 a look at it, was the most he was going to do.
14     Q   The ladder that you've described in the
15 statements, I think you indicated, was a 14- or
16 15-foot ladder; is that correct?
17     A   That's about correct. It was high enough to
18 get to each level.
19     Q   Do you recall when the ladder was used to
20 get from the porch roof to the roof of the building
21 itself how far above the roof line it extended, if at
22 all?

BRADFORD ASSOCIATES
HAL WALLS

Page 120

1      A   Not exactly. The ladder is put up at a
2  decent angle to allow the men to get on without
3  flipping back, so I imagine it was like, maybe, a
4  foot, six inches above the other -- the roof itself.
5  So if this were the roof encasing, it would be at
6  least like that, normal (indicating).
7      Q   When you're indicating "like that," are you
8  indicating --
9      A   Like six inches.
10     Q   Six inches above?
11     A   Yes.
12     Q   Was there any other way you knew of to get
13 to that roof?
14     A   There was another roof. I didn't think of
15 it at the time. It could have gone through the house,
16 but the house was occupied by a tenant, but we could
17 have gone through the access door.
18     Q   There was an access door to the roof?
19     A   Yes.
20         MR. COX: I'm just going to make the
21 objection that you and I discussed off the record.
22 I'm going to object to questions that go rather than

BRADFORD ASSOCIATES
HAL WALLS

Page 121

1  to the coverage issues, which form the predicate for
2  this lawsuit, and touch upon issues of liability,
3  whether it's the potential liability of Mr. Walls or
4  anyone else for Mr. Hinkle's injuries, because I don't
5  think they're relevant here. To that extent, I'll
6  object and continue to note my objections to the
7  questions, just by virtue of saying objection as
8  opposed to anything further.
9          MR. JOHNSON: You can have a continuing
10 objection to any questions you feel are in that
11 category.
12 BY MR. JOHNSON:
13     Q   To your knowledge, had Mr. Hinkle been up on
14 this roof before the day of the accident?
15         MR. COX: Objection.
16         THE WITNESS: I he think he had. I don't
17 recall that occasion.
18 BY MR. JOHNSON:
19     Q   But you don't have a specific memory of it?
20     A   No.
21     Q   To your knowledge, had Mr. Edwards been up
22 on this roof before?